IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FALLSTEAD,<br><br>        Plaintiff,<br><br>  v.<br><br>ASTRUE,<br><br>        Defendant. | No. C 12-00156 CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

In this social security case, Plaintiff Tabitha Fallstead ("Fallstead") appeals Defendant Michael J. Astrue's ("Commissioner's") denial of her application for supplemental security income ("SSI") benefits.  Before the Court are two motions:  Fallstead's Motion for Summary Judgment, MSJ (dkt. 19), and the Commissioner's Cross-Motion for Summary Judgment, XMSJ (dkt. 22).  The Court GRANTS each motion in part and REMANDS with instruction to calculate and award benefits.

**I.     BACKGROUND**

    **A.     Statement Of Facts**

Fallstead graduated valedictorian of her high school class and worked two jobs while in college.  Administrative Record ("AR") at 35, 183, 208, 423.  She received her AA degree in 2004 but was unable to continue her education once her health started to deteriorate.  Id. at 67, 183, 518.  In the spring of 2004, Fallstead began experiencing seizures and extreme fatigue.  Id. at 208, 520.  What followed was a number of medical evaluations attempting to determine what one doctor dubbed a "symptom picture [that] is somewhat nebulous and difficult to pin down."  Id. at 424.

In May 2004, Fallstead began meeting regularly with primary care physician and internist, Mark Shapiro, M.D. Id. at 252-53. He determined that she had some generalized myoclonic jerking, some intermittent ear ringing, and feelings of paranoia and burning out. Id. In July 2004, Fallstead met with neurologist Jeffrey L. Ordstadt, M.D., who thought Fallstead might have myclonic epilepsy. Id. at 251-52. In October 2004, Fallstead began meeting with cardiac electrophysiologist Peter Chang-Sing, M.D. Id. at 250. In the spring of 2005, Dr. Chang-Sing phoned Dr. Shapiro to report that his staff witnessed Fallstead have two to three seizures without loss of consciousness. Id. at 248. Dr. Chang-Sing implanted a cardiac loop recorder. Id. at 274.

Around December 2005, Fallstead reached out to treating physician and internal medicine provider, Rafael B. Stricker, M.D., who is a Lyme disease expert. Id. at 43, 209. Fallstead's test results were negative for Lyme disease but not for Bartonella henslae. Id. at 43-44. Dr. Stricker therefore felt comfortable diagnosing her with Lyme disease and made a provisional diagnosis of Bartonella infection. Id. at 43-44. By the fall of 2005, Dr. Shapiro observed that Fallstead still falls down a lot and has right ear pain. Id.

In 2006, epileptologist David King-Stevens, M.D., conducted a one-week epilepsy evaluation on Fallstead and ruled out seizure disorder (i.e., not epilepsy or any electrographic correlate for her myoclonus or choreoathetoid movements) but diagnosed her with nonepileptic motor episodes. Id. at 360. By April 2006, Dr. Ordstadt determined Fallstead has psychogenic pseudo seizures, or some form of somatoform conversion disorder. Id. at 273. Dr. Ordstadt said that he was unable to provide further treatment since he could not identify a specific neurologic condition and therefore recommended psychiatric evaluation. Id. In August 2006, Fallstead met with neurologist Ilkcan Cogker, M.D., who opined that she has problems with movement that are not seizures but rather tic disorder. Id. at 340-41. He recommended she do cognitive rehabilitation. Id. That month, Fallstead also consulted Stanford Movement Disorders Clinic psychiatrist John J. Berry, M.D., who concluded that Fallstead's symptoms were consistent with major depression. Id. at 244, 367. Dr. Berry

recommended proceeding cautiously, in light of Fallstead's reports of auditory hallucinations and paranoid ideation. Id.

In December 2007, consultive examining clinical psychologist William L. Schwimmer, Ph.D., reported that Fallstead has anxiety disorder and depressive disorder, employment problems, and self-reported seizures, dry eyes, and fatigue. Id. at 385. In March 2008, consulting psychiatrist Charles R. Hudson, M.D., examined Fallstead and determined that her symptoms probably reflect a combination of somatic and psychic difficulties. Id. at 423. Dr. Hudson recommended, as possible beneficial options, antidepressant medication for her dysphoria and anxiety symptoms and stimulant-type medication for her chronic fatigue. Id.

Fallstead consulted treating psychiatrist Olga Segal, M.D., starting in 2009. Id. at 459-63. In February 2010, Dr. Segal's diagnostic impressions listed conversion disorder with seizures, major depressive disorder, personality disorder, obsessive-compulsive and schizoid traits, non-epileptic seizures, and dry eyes. Id. at 210, 522-23. That same month, clinical psychologist Philip M. Cushman, Ph.D., consultively examined Fallstead and his diagnostic impressions ruled out conversion disorder with seizures, major depressive disorder, and personality disorder. Id. at 516-23. He concluded that Fallstead appears capable of performing detailed, complex, simple, and repetitive tasks in a vocation setting but will "have great difficulties with regular attendance and consistent participation with a large variety of somatic complaints and even odd behaviors, making it difficult to maintain regular work." Id. at 523. He noted depressive disorder, sociophobia, and Lyme disease. Id. at 463.

Non-examining state agency physicians, Kelly J. Loomis, M.D., David W. Pong, M.D., and Antoine G. Dipsa, M.D., reviewed Fallstead's medical records. Id. at 373-78, 389-91, 425-26.

### B. Procedural History

In September 2007, Fallstead filed for SSI benefits pursuant to Title XVI of the Social Security Act ("SSA"). Id. at 19. Fallstead's application for benefits alleged she has suffered from somatoform disorders since September 2004. Id. After her application was denied and

1  upon reconsideration, she requested a hearing before the Administrative Law Judge ("ALJ").
2  Id. at 105.  Following the May 2010 administrative hearing, the ALJ determined Fallstead
3  has not been disabled within the meaning of the SSA.  Id.  The Appeals Council denied
4  Fallstead's request to review the ALJ decision, making it the final decision of the
5  Commissioner.  Id. at 1.  Fallstead then filed this action.

## II.     LEGAL STANDARD

### A.     Judicial Review Of The Final Decision Of The Commissioner

The district court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158-59 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  Molina v. Astrue, 674 F.3d 1104, 1110-11 (9th Cir. 2012).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The district court must consider the record as a whole, including evidence that supports and detracts from the Commissioner's conclusion.  Frost v. Barnhart, 314 F.3d 359, 367 (9th Cir. 2002) (citing Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985)).  The court may not affirm the Commissioner's decision "simply by isolating a specific quantum of supporting evidence."  Id.  And, if evidence reasonably supports affirming or overturning the decision, the court may not substitute its judgment for that of the Commissioner on review.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).

Summary judgment is a method for disposing of an action in which there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The burden of establishing the lack of a genuine issue of material fact is on the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  An issue is "genuine" only if a reasonable fact finder would find the evidence sufficient to find for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A fact is

"material" if it could affect the outcome of the case.  See id. at 248.  All inferences drawn must be viewed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

### B. Standard For Determining Disability

A person is "disabled" for purposes of receiving SSI if he or she is unable to engage in substantially gainful activity ("SGA") due to a physical or mental impairment that has lasted for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  The ALJ evaluates a disability claim using a five-step sequential process.  See 20 C.F.R § 416.920(a)(4).  In the first step, the ALJ must determine whether the claimant is currently engaged in SGA.  Id. § 416.920(a)(4)(i).  If the claimant is not so engaged, the second step requires the ALJ to determine whether the claimant has a "severe" impairment which significantly limits his or her ability to perform basic work activities.  Id. § 416.920(a)(4)(ii).  If the ALJ concludes the claimant does not have a "severe" impairment, the claimant is not "disabled" and the claim is denied.  Id.

If the claimant has a "severe" impairment, the third step requires the ALJ to determine whether the impairment meets or equals the criteria of an impairment listed in the relevant regulation.  Id. § 404, Subpt. P, App. 1; id. § 416.920(a)(4)(iii).  If the claimant does not meet or equal the criteria of a listed impairment, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC") to perform his or her past work.  Id. § 416.920(a)(4)(iv).  If so, the claimant is not "disabled" and the claim must be denied.  Id.  In the fifth step, the burden shifts to the Commissioner to establish that the claimant can perform other substantially gainful work.  Id. § 416.920(a)(4)(v).  If the Commissioner fails to meet this burden, the claimant must be found disabled.  Id.

### III. DISCUSSION

Based on the five-step sequential analysis, the ALJ determined Fallstead is not "disabled" for purposes of receiving SSI benefits.  Steps one and two of the five-step

evaluation are not at issue.[1] Fallstead does, however, contest the ALJ's findings as to steps three and four. See generally MSJ. Specifically, Fallstead avers that the Commissioner's denial of her application should be vacated and remanded for payment of benefits in light of the following errors in the ALJ opinion: (1) failure to properly credit the opinions of Fallstead's treating and examining doctors; (2) failure to recognize Fallstead met or equaled the listed impairment of somatoform disorder; (3) improperly discrediting Fallstead's testimony; and (4) erroneously determining Fallstead had a greater RFC than supported by the record. See MSJ at 11. Conversely, the Commissioner urges that substantial evidence supports the ALJ's decision to deny benefits. See XMSJ at 1.

### A. Substantial Evidence Supports The ALJ's Decision At Step Three

At step three, the ALJ found that Fallstead's impairments do not meet or equal the regulatory listed impairment somatoform, Listing 12.07.[2] AR at 22.

#### 1. Because The ALJ Determined Paragraphs "B" And "C" Were Not Satisfied, Analyzing "Paragraph A" Criteria Is Unnecessary

Fallstead argues that the ALJ erred in determining Fallstead did not meet or equal a listed impairment because the ALJ failed to consider whether Fallstead's impairment satisfied the "paragraph A" criteria. MSJ at 15-16. As the Commissioner correctly points out, however, to meet or equal the requirements of Listing 12.07, Fallstead's impairments must meet either "paragraph B" or "paragraph C," in addition to "paragraph A." XMSJ at 3. For a Listing 12.07, the specified medical criteria are broken up into three categories: "paragraph A," "paragraph B," and "paragraph C" criteria. 20 C.F.R. § 404, Subpt. P, App.

---

[1] At step one, the ALJ found Fallstead has not engaged in SGA since the date of her application, September 28, 2007. AR at 21. At step two, the ALJ determined Fallstead has the following severe impairments: Lyme disease, seizure disorder, conversion disorder, depressive disorder, and anxiety disorder. Id.

[2] The parties' motions only address Listing 12.07 (Somatoform) and do not challenge the ALJ's finding as to Fallstead's impairments meeting or equaling Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety Related Disorders). MSJ at 15-16; XMSJ at 3.

6

1.[3]  The required level of severity for a listed disorder is met when the requirements in both "paragraph A" and "paragraph B" are satisfied, or when the requirements in both "paragraph A" and "paragraph C" are satisfied. Id. Because the ALJ determined that "paragraph B" and "paragraph C"[4] were not satisfied, a discussion of the "paragraph A" criteria would be superfluous.

### 2. The ALJ Properly Determined Fallstead's Impairments Do Not Meet Or Equal "Paragraph B"

Fallstead next contends the ALJ disregarded treating physician Dr. Stricker's evaluation, which opined that Fallstead's impairments meet or equal the "paragraph B" criteria. MSJ at 16. But, as the Commissioner notes, the ALJ should consider the medical record as a whole when determining whether a claimant's functional limitations satisfy the listing criteria. XMSJ at 5. Because Dr. Stricker's opinion is inconsistent with the record as a whole, the Court finds that substantial evidence supports the ALJ's decision.

In determining whether Fallstead meets or equals Listing 12.07, "[a] generalized assertion of functional problems is not enough to establish disability at step three." Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999) (citing 20 C.F.R. § 404.1526). "The mere diagnosis of an impairment listed in 20 C.F.R. Appendix 1, Subpart P, § 4.12 is not sufficient to sustain a finding of disability." Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). To satisfy the "paragraph B" criteria, a claimant's mental impairment must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in

---

[3] The "paragraph A" criteria differ depending on the particular listing. See 20 C.F.R. § 404, Subpt. P, App. 1. "Paragraph B" requires that the mental impairment result in at least two of four listed restrictions. Id. "Paragraph C" requires a finding that the claimant's impairment results in a "complete inability to function independently outside the area of one's home." Id.

[4] The parties do not contest the ALJ's determination that Fallstead's impairments do not meet or equal the "paragraph C" requirements. AR at 23.

7

maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1. A marked limitation means more than "moderate" but less than "extreme." Id.

Here, the ALJ concluded Fallstead's mental impairment was "mild" with respect to restrictions of daily living, "moderate" with respect to difficulties in maintaining social functioning, and "moderate" with respect to difficulties in maintaining concentration, persistence, or pace. AR at 23. The ALJ found no episodes of decompensation. Id. Because Fallstead's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and one "repeated" episode of decompensation, the ALJ concluded "paragraph B" was not satisfied. Id.

Contrary to Fallstead's argument, Dr. Stricker's opinion does not establish that Fallstead meets the "paragraph B" criteria. First, Dr. Stricker evaluated Fallstead's mental impairment using a dissimilar metric, evaluating Fallstead's social functioning and concentration abilities on an "unlimited" to "poor" scale. Id. at 511-12. Whether these classify as a "marked" restriction is open to interpretation.[5]

Second, even assuming Dr. Stricker's findings of Fallstead's mental impairments as "poor" translate into "marked" restrictions, the record as a whole contradicts this finding. In support of finding that Fallstead did not meet the "paragraph B" criteria, the ALJ cited to the record's medical opinions and claimant report, which both contradict Dr. Stricker's opinion. Specifically, the medical opinions of examining psychologists Dr. Cushman and Dr. Schwimmer and non-examining state physician Dr. Loomis contradict treating physician Dr. Stricker's findings. See id. at 384, 400, 513. And, Fallstead's written function report aligns with the ALJ's "paragraph B" determination: with respect to daily living, she engages in household chores and yard work, cares for pets, prepares simple meals, and shops in stores or

---

[5] Dr. Stricker's mental evaluation form provides for the following definition of "poor": "the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity." AR at 511. In contrast, forms that adhere to the social security rating terms provide for the following definition of a "marked" restriction: "[t]here is serious limitation in this area. There is a substantial loss in the ability to effectively function." Id. at 513.

8

on the computer; in regards to social functioning, she socializes daily with family and visitors and attends spiritual meetings around once a week; and, for concentration, persistence, and pace, she uses the computer, crochets for three to four hours per day, and enjoys reading, sewing, watching television, making jewelry, and playing video games. AR at 61-62, 161-65.

Thus, the ALJ provided detailed, reasoned, and legitimate rationales to reject Dr. Stricker's opinion. The decision is therefore supported by substantial evidence and the Court AFFIRMS this portion of the ALJ's decision and GRANTS the Commissioner's Cross-Motion for Summary Judgment in part.

### B. Substantial Evidence Does Not Support The ALJ's Determination of Fallstead's Mental And Functional RFC At Step Four

At step four, the ALJ determined Fallstead has the RFC to perform a full range of work at all exertional levels, limited by only a few enumerated restrictions.[6] The RFC determination, however, does not include Fallstead's subjective symptomss—that is, seizure induced limitations, loud noise restrictions, brain fog complaints, and concentration problems—because the ALJ found Fallstead's testimony not credible. Id. at 27. This constituted legal error.

#### 1. The ALJ Afforded Proper Weight To Fallstead's Treating And Examining Physicians' Opinions

Fallstead contends the ALJ did not properly credit the medical opinions of her consultive psychological examiner Dr. Cushman, treating internal medicine provider Dr. Shapiro, treating physician Dr. Stricker, and neurologist Dr. Ordstadt. See MSJ at 12-15. Contrary to Fallstead's assertion, the ALJ's rejection of these opinions was supported by substantial evidence in the record.

As a preliminary matter, an RFC assessment should consider "only functional limitations and restrictions that result from an individual's medically determinable

---

[6] Fallstead should not climb ladders, ropes, or scaffolding; she can frequently climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl; she must avoid all exposure to hazards as a precautionary measure for potential seizures; and, she is limited to one- to two-step instruction jobs that require only occasional contact with supervisors, co-workers, and the public. AR at 24.

9

impairment or combination of impairments, including the impact of any related symptoms." Social Security Ruling ("SSR") 96-8p. Furthermore, the "RFC assessment must always consider and address medical source opinions," and in cases where the ALJ's assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." Id. Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion as to the nature and severity of a claimant's impairment(s). 20 C.F.R. § 416.927(c)(2); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). Nevertheless, a treating physician's opinion is only regarded as controlling where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). And like the opinion of a treating doctor, the opinion of an examining doctor may only be rejected for "specific and legitimate" reasons that are supported by substantial evidence in the record. Andrews v. Shala, 53 F.3d 1035, 1043 (9th Cir. 1995). The opinion of a nontreating physician that is based on "independent clinical findings that differ from those of the treating physician" may constitute substantial evidence. Id. at 1041 (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).[7]

---

[7] "Independent clinical findings" can be (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not considered. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

### a. Dr. Cushman

Fallstead challenges the ALJ's evaluation of examining psychologist Dr. Cushman's report on a number of grounds. First, Fallstead argues the ALJ's analysis of Dr. Cushman's RFC determination is incomplete and misstates the medical findings. MSJ at 12. Specifically, Fallstead alleges the ALJ misinterpreted Fallstead's "inability to attend . . . to mean 3 to 4 days a month." Id. But, the ALJ did not misstate the medical findings. The ALJ's reference to three to four days attendance was derived from Fallstead's own testimony, not Dr. Cushman's report. See id. at 61 (providing Fallstead's testimony that out of a seven day week, "the majority [of the days she] can do things like maybe six days out of the week").

Second, Fallstead claims the ALJ failed to provide any weight to Dr. Cushman's opinion, as required by SSR 96-2p. Id. But, the ALJ's decision does not, by any means, refute Dr. Cushman's statement that Fallstead will "have great difficulties with regular attendance." Id. at 523. In fact, the ALJ opinion quotes that language. Id. at 25. And, Dr. Cushman was an examining, not treating, doctor whose opinions were inconsistent with the record. Thus, SSR 96-2p's controlling weight mandate does not apply. See SSR 96-2p ("controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record").

Third, Fallstead contends the ALJ's RFC determination lacks substantial evidence because Dr. Cushman's opinion was not compared to those of Drs. Ortdstadt, Striker, King-Stephens, Shapiro, Barry, Klepitskaya, Hudson, and Segal. MSJ at 12-13. But, as the Commissioner points out, the "opinions of Drs. Pong, Dipsia, Schwimmer, Hudson, Loomis, and Gallucci constituted substantial evidence in support of the ALJ's RFC finding." XMSJ at 6. Non-examining physicians Dr. Pong and Dr. Dipsa reached similar RFC assessments. See AR at 374-76, 426. And, the ALJ provided for a more restrictive finding than what non-examining physician Dr. Loomis believed to be Fallstead's RFC. Id. at 391. Thus, in examining the intensity, persistence, and limiting effects of Fallstead's symptoms to determine the extent to which they limit functioning, the ALJ supported her RFC determination with substantial evidence from the record. See Thomas v. Barnhart, 278 F.3d

11

947, 957 (9th Cir. 2002) (citing Magallanes, 881 F.2d at 751) ("The opinions of . . . non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

### b. Dr. Shapiro

Fallstead next argues the ALJ "never discussed" treating physician Dr. Shapiro's diagnosis and thus the ALJ's opinion resulted in legal error. MSJ at 14. According to Fallstead, a treating doctor's opinion is "the preferred source under the Commissioner's regulations" and is "generally entitled to greater deference." Id. In response, the Commissioner points out that Fallstead "fails to identify what opinion, symptoms, testimony or diagnoses she is referring to, nor does she state any functional limitations assessed by Dr. Shapiro." XMSJ at 13.

Fallstead had a chance to cure this briefing defect and respond to the Commissioner's allegation that Fallstead's Motion for Summary Judgment did not fully explain the significance of Dr. Shapiro's medical opinion; i.e., that Dr. Shapiro's evaluation did not even attempt to examine Fallstead's functional limitations. See AR at 238-69. She failed to do so in her subsequent response motion. See generally Reply to XMSJ (dkt. 23).

### c. Dr. Stricker

Fallstead claims the ALJ's characterization of treating physician Dr. Stricker's evaluation should be discredited because the ALJ failed to compare Dr. Stricker's evaluation to that of Drs. Cushman, Ortdstadt, King-Stephens, Shapiro, Barry, Klepitskaya, Hudson, and Segal. MSJ at 14. But, the ALJ explicitly stated that she did "not find Dr. Stricker's physical or mental [RFC] assessments credible" and gave three reasons explaining her decision. AR at 26-27.

First, the ALJ faulted Dr. Stricker's conclusions as to Fallstead's physical impairments because there was no medical support for his enumerated restrictions. Id. at 26, 485-86. For example, the ALJ points out that Dr. Stricker attributes his RFC assessment to Fallstead's need to alternate between sitting and standing and her vertigo and dyspnea, yet there is nothing in the record to support these findings. Id. at 26. Therefore, even though Dr.

12

Stricker is Fallstead's main treating doctor, "[w]hen confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Second, the ALJ highlighted that Dr. Stricker's mental RFC assessment form was based on the same impairments used in his physical form. AR at 27. As the ALJ said, Dr. Stricker is not a psychiatrist and his findings are inconsistent with Dr. Hudson and Dr. Segal, who did test Fallstead's global assessment of functioning. Id. Granted the ALJ may not discredit Dr. Stricker's mental assessment simply because he is not a specialist in the field of psychiatry or psychology, it is equally true that more weight should be given to the opinion of a specialist in that field. See 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist").

Third, the ALJ questioned Dr. Stricker's Lyme disease diagnosis in light of Fallstead testing negatively. AR at 27. And, additional evidence in the record supports the ALJ's hesitation to accept Dr. Stricker's Lyme disease diagnosis. For instance, during the administrative hearing, Fallstead testified that Dr. Stricker said people with Lyme disease can also have seizures but "thought it was strange." Id. at 44. This statement, among others, combined with the negative test results constitute substantial evidence. See SSR 96-2p ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.").

### d.     Dr. Ordstadt

Fallstead also contends the "ALJ mischaracterized the functional limitation opinion" provided by her neurologist Dr. Ordstadt. MSJ at 27. However, as noted by the Commissioner, Fallstead did not explain how the ALJ inaccurately portrayed Dr. Ordstadt's report. XMSJ at 15. Fallstead had an opportunity to respond to this concern in her reply brief but failed to do so. See generally Reply to XMSJ. Because the ALJ's opinion cited Dr.

1 Ordstadt's findings and because it is unclear how the ALJ allegedly mischaracterized his
2 opinion, substantial evidence supports the ALJ's decision.  AR at 24 ("[Dr.] Ordstadt []
3 opined . . . that the claimant had psychogenic pseduo seizures, or some
4 form of somatoform conversion disorder, and recommended a consultation with a
5 psychiatrist").

6 In sum, when presented with a number of varying doctor evaluations as to Fallstead's
7 disability, "[w]here evidence is susceptible to more than one rational interpretation, it is the
8 ALJ's conclusion that must be upheld."  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir.
9 2005).  The Court therefore AFFIRMS this portion of the ALJ's decision and GRANTS the
10 Commissioner's Motion for Summary Judgment in part.

### 2. The ALJ's Credibility Findings Improperly Relied On A Lack of Objective Medical Evidence

13 Fallstead states that the ALJ erred in finding Fallstead's testimony "not entirely
14 credible."  MSJ at 17-18.  Specifically, she contends that the ALJ's credibility determination
15 erroneously relied on limited activities of daily living and failed to give clear and convincing
16 reasons for rejecting Fallstead's subjective symptoms.  Reply to XMSJ at 17.  The
17 Commissioner counters that the ALJ is required to make specific credibility findings and did
18 so by providing a valid basis for discrediting Fallstead's allegations.  XMSJ at 14.  The Court
19 concludes that the ALJ's credibility findings improperly focused on a lack of corroborating
20 objective evidence.

21 As a threshold matter, "[f]or the ALJ to reject the claimant's complaints, [she] must
22 provide 'specific, cogent reasons for the disbelief.'"  Lester, 81 F.3d at 834 (quoting Rashad
23 v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990)).  "Once the claimant produces medical
24 evidence of an underlying impairment, the Commissioner may not discredit the claimant's
25 testimony as to the subjective symptoms merely because they are unsupported by objective
26 evidence."  Id. (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991)); see also
27 Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1234 (9th Cir. 2011) (finding that a

conflict between the claimant's testimony and the ALJ's RFC determination legally insufficient to support the ALJ's credibility finding).

### a. Seizure disorder

In discrediting Fallstead's subjective seizure complaints, the ALJ stated that "there is no objective evidence of seizures as [Fallstead] has had a normal brain CT scan, a normal neurological exam, a normal EEG, and a video EEG that showed non-epileptic seizures." AR at 26 (citations ommitted). But, as previously mentioned, "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Bunnell, 947 F.2d at 343). And, even then, this determination stands in stark contrast to the ALJ's conclusion at step two of the five-step sequential analysis that Fallstead "has the following severe impairments: Lyme disease, seizure disorder, [and] conversion disorder," among others. AR at 21 (emphasis added); Part III, supra, fn.2.

The record is replete with documented instances of Fallstead's seizure-like experiences, which are relevant to the ALJ's final RFC determination. For example, as recent as the ALJ's administrative hearing, a deputy security officer attested to witnessing Fallstead experience a seizure. AR at 224-26. The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id.

Moreover, the ALJ's purported reason for rejecting Fallstead's subjective testimony is unconvincing. The ALJ asserts that "there is a glaring inconsistency in that [Fallstead] has been diagnosed with seizures, yet she retains her driver's license and has reported driving." Id. at 26. And, the ALJ claims, "the diagnosing doctor is required to notify the Department of Motor Vehicles ["DMV"], which often results in the suspension of the individuals driver's license." Id. But, not only does the ALJ lack knowledge of whether the diagnosing doctor

15

1  did in fact notify the DMV, she also misstates the law. As Fallstead's motion points out,
2  California law requires reporting only "disorders characterized by lapse of consciousness."[8]
3  But, Fallstead's disorder does not implicate this reporting requirement, as she does not suffer
4  from epilepsy. Id. at 68.[9] Rather she suffers from some form of somatoform conversion
5  disorder that does not result in a lapse of consciousness. Id. at 248 ("seizures w/o LOC [loss
6  of consciousness]"). Furthermore, Fallstead's function report says she does not drive
7  because she gets "too tired." Id. at 290. This militates against the ALJ's conjecture that a
8  lapse of consciousness is behind her driving patterns.

### b.     Concentration and brain fog

Because Fallstead was able to answer questions and provide dates during her one-hour hearing, the ALJ questioned Fallstead's testimony that she is unable to concentrate, carry on a conversation for more than ten to fifteen minutes, and remember dates and events. Id. at 27. But, the ALJ's reliance on Fallstead's behavior at the hearing fails to appreciate both objective medical findings and the inconsistency of her symptoms. The medical opinions concluded the Fallstead has "moderate" difficulties with concentration. Id. at 23. And, Fallstead testified that her functionally limiting symptoms ebb and flow, largely dependent upon when her sporadic symptoms, such as brain fog, occur. Id. at 44-46.

Correspondingly, the ALJ rejected Fallstead's mother's testimony, because it contradicted Fallstead's own testimony and because the record as a whole did not support the level of limitation to which she testified. Id. at 27. But, Fallstead's symptoms are inconsistent; some days are worse than others. Id. at 61. Moreover, Fallstead's mother testified that when Fallstead's first application for disability was denied, Fallstead thought she was getting better and did not appeal the decision; however, Fallstead's symptoms then progressively worsened again. Id. at 73. Her mother expressed her belief that "the biggest

---

[8] "Every physician and surgeon shall report immediately . . . every patient at least 14 years of age or older whom the physician and surgeon has diagnosed as having a case of a disorder characterized by lapses of consciousness." Cal. Health & Safety Code § 103900(a).

[9] The DMV may refuse to issue a driver's license to any person "[w]ho has a disorder characterized by lapses of consciousness . . . unless the department has medical information which indicates the person may safely operate a motor vehicle." Cal. Veh. Code § 12806.

reason" Fallstead is "not able to hold down a job" is because Fallstead's "health is so inconsistent." Id. at 70.

Accordingly, the ALJ's reasons for rejecting Fallstead's subjective symptoms of concentration problems and brain fog is not supported by substantial evidence.

### c. Loud noises

The ALJ also deemed Fallstead's testimony that she is sensitive to loud noises not credible. Id. at 50, 53, 63. The ALJ's chief concern was that Fallstead did not provide medical evidence to support her assertion. Id. at 27. But, Dr. Stricker, Fallstead's main treating doctor, corroborates that she is sensitive to noise. Id. at 527. And, "[t]o say that medical opinions are not supported by sufficient objective findings . . . does not achieve the level of specificity [the Ninth Circuit's] prior cases have required." Embrey v. Brown, 849 F.2d 418, 421-22 (9th Cir. 1988). The record indicates that loud noises trigger Fallstead's seizure-like symptoms; e.g., Fallstead wrote a letter to be excused from jury duty after she had a seizure the last time "the judge's voice over the speaker system was too loud for her." AR at 212-13. Thus, Fallstead's subjective testimony, coupled with her treating physician's medical reports, overwhelm the ALJ's conclusory rejection of such evidence. Substantial evidence does not support the ALJ's decision here.

In assessing Fallstead's RFC, "[c]areful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8P (emphasis added). Because "the ALJ did not provide clear and convincing reasons for excluding [Fallstead's subjective] symptoms from [her] assessment of [Fallstead's] RFC, substantial evidence does not support the assessment." Robbins, 466 F.3d at 883. Accordingly, the ALJ's RFC determination at step four, which did not account for Fallstead's and her mother's testimony on credibility grounds, was not supported by substantial evidence. The Court therefore REVERSES this portion of the ALJ's decision and GRANTS Fallstead's Motion for Summary Judgment in part.

### C. The ALJ Did Not Meet Its Burden And Establish That There Are Jobs That Exist In The National Economy That Fallstead Can Perform

"At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such jobs in the national economy. At the hearing, the ALJ poses hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." Tackett, 180 F.3d at 1101 (citing Gamer v. Secretary of Health and Human Servs., 815 F.2d 1275, 1279 (9th Cir. 1987)).

Here, the credibility error at step four of the ALJ's RFC determination was a deciding factor in whether vocational expert Stephen Davis ("VE") found Fallstead employable. See Gallant, 753 F.2d at 1456 ("Because . . . the ALJ had no clear or convincing reasons for rejecting [claimant's subjective allegations], claimant's [symptoms] should have formed a part of the ALJ's question to the [vocational] expert"). "A hypothetical question should set out all of the claimant's impairments." Id. (emphasis added). Thus, the ALJ reliance on a mistaken RFC determination that did not credit Fallstead's subjective symptoms resulted in an incorrect conclusion that Fallstead could perform jobs in the national economy. AR at 28. Taking into account Fallstead's subjective symptoms, she would not be able to perform the unskilled occupations of an exertionally medium hand packager or a sedentary assembler, as the ALJ claims.

First, Fallstead's unpredictable seizure disorder symptoms affect her ability to regularly attend work. The ALJ asked the VE whether a person "unable to maintain regular attendance" by not attending three or four days a month would be able to perform the recommended jobs. Id. at 77. The VE responded, "No, they wouldn't be able to work." Id. Based on this testimony, it appears that Fallstead's seizure disorder—held by the ALJ at step two of the analysis to be severe—would significantly impact Fallstead's ability to attain and maintain the two occupational options listed in the ALJ's opinion.

Second, Fallstead's testimony as to loud noise, brain fog, and concentration similarly affect the determination that there are jobs in the national economy that Fallstead could perform. The VE testified that "there's going to be noise in any job" and that a "[h]and

packager is loud so we'll rule that out." Id. at 77-78. And, the VE clarified, "if your question is would the person be able to do these jobs based on the noise level, no, they wouldn't if that's a factor, that's a major factor." Id. at 78. The VE proposed a surveillance systems monitor as a job that does not have a lot of noise involved. Id. at 79. But, the VE said, that job "would not be appropriate" for a claimant who has brain fogs or problems concentrating. Id. at 81. This testimony reveals that the ALJ's failure to take into account Fallstead's subjective limitations of regular attendance, loud noises, concentration, and brain fog (on flawed credibility grounds) changes the outcome. Fallstead's counsel "posed to the [VE] not only a hypothetical question based on the ALJ's RFC assessment, but also hypothetical questions that incorporated the . . . physical limitations testified to by" Fallstead. Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007). And, while "the ALJ later decided that these limitations were not credible, the [VE's] testimony establishes that taking [Fallstead's] testimony as true, [s]he was disabled." Id.

Since the ALJ "improperly rejected testimony as to the severity of . . . symptoms . . . [and] failed to provide clear and convincing reasons for finding [claimant's] . . . symptoms not credible, [the ALJ was] required to include these limitations in [her] assessment of [claimant's] RFC" and in her hypothetical presented to the VE. Id. at 1035. Consequently, the ALJ did not meet her burden of showing the claimant can perform work in the national economy. See e.g., Ballard v. Astrue, No. CIV S-08-1299 DAD, 2009 WL 3126282, at *1 (E.D. Cal. Sept. 23, 2009).

"In cases where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's . . . testimony were credited," a court will take that testimony to be established as true. Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1401 (9th Cir. 1988). That is to say:

> The decision whether to remand a case for additional evidence or to simply award benefits is within the discretion of the court. The Ninth Circuit has stated that, '[g]enerally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has

been thoroughly developed.' This rule recognizes the importance of expediting disability claims.

Ballard, 2009 WL 3126282, at *1 (internal citations omitted). Because it was legal error to disregard Fallstead's testimony as to her heightened exertional and nonexertional limitations in making an RFC determination and because the VE was unable to identify a possible job for a claimant with these impairments, the Court REVERSES the Commissioner's decision that Fallstead is not disabled.

## IV. CONCLUSION

For the foregoing reasons, the Court:

(1) GRANTS the Commissioner's Cross-Motion for Summary Judgment as to step three, because substantial evidence supports the ALJ's finding that Fallstead's impairments do not meet or equal the regulatory listed impairment somatoform;

(2) GRANTS the Commissioner's Cross-Motion for Summary Judgment as to the first part of step four, because substantial evidence supports the ALJ's weighing of treating and examining physicians' opinions;

(3) GRANTS Fallstead's Motion for Summary Judgment as to the second part of step four, because substantial evidence did not support a finding that Fallstead's and her mother's testimony was not credible; and

(4) REMANDS with instructions to calculate and award benefits in accordance with this Court's order.

**IT IS SO ORDERED.**

Dated: September 27, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE